# In the United States Court of Federal Claims

No. 03-1242C

(Filed: November 19, 2009)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * )<br><br>UNITED PARTITION SYSTEMS, INC.,  )<br><br>)<br><br>)<br>**Plaintiff,**  )<br>**v.**  )<br><br>)<br>**THE UNITED STATES,**  )<br><br>)<br>**Defendant.**  )<br><br>)<br>* * * * * * * * * * * * * * * * * * * * * * * * | Post-trial decision on claim for damages respecting a construction contract allegedly terminated improperly for default; consequences of termination by contracting officer who did not have jurisdiction; resulting constructive termination for convenience; damages |

Laurence Schor, McManus, Schor, Asmar & Darden, L.L.P., Washington, D.C., for plaintiff.

Robert C. Bigler, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Assistant Attorney General Tony West, Jeanne E. Davidson, Director, Commercial Litigation Branch, and Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

United Partition Systems, Inc. ("United") manufactures and installs prefabricated modular buildings primarily for indoor use, and United held a Multiple Award Schedule Contract with the General Services Administration ("GSA") for provision of those buildings to federal agencies. The Department of the Air Force ("Air Force"), 56th Contracting Squadron at Luke Air Force Base ("Luke AFB"), contracted with United to install a prefabricated building inside one of their large warehouses.  United undertook to perform under the contract and substantially completed performance, but the Air Force questioned and then rejected United's performance as defective in part and terminated the contract for default.  United filed a claim with the Air Force's contracting

1

officer, but at the agency level the Air Force denied that United was due anything under the contract and instead claimed that United was obliged to pay for the removal of several other prefabricated buildings that were required to be demolished after United's new building had been completed.  United took an appeal to the Armed Services Board of Contract Appeals ("ASBCA" or "Board"), where the key question was whether the Air Force's contracting officer had authority to act on the claims.  The Board ruled that the Air Force's contracting officer did not have such power but rather that United's claim should be considered by a contracting officer with GSA.  *See United Partition Sys., Inc.*, ASBCA Nos. 53915, 53916, 03-02 BCA ¶ 32,264, 2003 WL 2012838 (2003) (dismissing United's appeals without prejudice for lack of jurisdiction). United then filed the present case in this court to protect its rights in light of the twelve-month statute of limitations in the Contract Disputes Act, 41 U.S.C. § 609(a)(3), which was about to expire based on the date of the Air Force's contracting officer's decision.  Subsequently, GSA's contracting officer issued a decision which was consistent in all respects with that previously issued by the Air Force's contracting officer.  This court then rejected the government's motion to dismiss United's complaint, ruling that the Air Force's contracting officer had no authority to act and granting United leave to file a supplemental complaint to encompass the final decision issued by GSA's contracting officer.  *United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627, 644-45 (2004).

After extended discovery and negotiations between the parties, the parties filed joint stipulations of fact, trial was held commencing on June 8, 2009, the parties completed post-trial briefing, and the case is now ready for disposition.  The case has been unduly complicated by procedural irregularities arising from actions taken or not taken by the Air Force with respect to the contract.

# FACTS[1]

## A.  *The Contract with GSA and the Delivery Order from the Air Force under the Contract*

In 1983, United submitted its products to GSA for inclusion on the Federal Supply Schedule ("FSS"), *see* Tr. 29:2-5 (Test. of Robert Kaminski, the CFO of United),[2] and obtained a Multiple Award Schedule ("MAS") contract – part of the FSS program through which federal agencies may acquire a variety of commonly used supplies and services through simplified procedures and rates that have been previously negotiated by GSA.  *See* 48 C.F.R. § 8.402(a)

---

[1]This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims.  Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

[2]Citations to the trial transcript are to "Tr. __."  Plaintiff's exhibits are denoted as "PX __," and joint exhibits are represented as "JX __."  The Joint Stipulation is cited as "Stip. ¶ __."

(1999).[3]  When a federal agency decided that it wished to purchase an item covered by the contract, *i.e.*, a prefabricated building, the agency would issue a Delivery Order for that purpose. FAR § 52.216-18 (1999) ("Ordering"); JX 4-13.

In 1999, United renewed its contract with GSA for the provision of prefabricated buildings to federal agencies for a five-year term extending through June 30, 2004.  *See* JX 4-1 to 2 ("GSA Contract").  The contract was signed by a GSA contracting officer and, by its terms, was to be administered by GSA.  *See* JX 4-2.  United's GSA price list included standard, fire-retardant, sound-reduction, and insulated wall panels.  *See* JX 19-4.  United represented that the fire-retardant panels were Class A fire rated.  *See id.* ("Fire Retardant Panels have treated surfaces & cores, UL Class 1 (F.S. 25 or less).").[4]

On March 20, 2000, the Air Force issued a solicitation requesting price quotes from all holders of FSS-MAS contracts for the design, manufacture, and construction of a one-story modular building at Luke AFB.  Stip. ¶ 1.  The Statement of Work for the solicitation required that "[t]he modular building walls shall be 4" minimum thickness 9' high and shall be Class-A fire rated and shall be UL Approved; color to be selected upon award."  JX 1-2 at ¶ 1.  The Statement of Work also required that electric wiring, telephone cable and LAN lines be installed in "UL Approved raceway channels."  JX 1-2 at ¶¶ 4-5.  In addition to installing a new building, the contractor was to demolish and remove three existing modular offices.  JX 1-4 at ¶ 17.  United was among the companies solicited by the Air Force, and United generated a proposal in response.  Tr. 136:5-21 (Test. of Michael Kaminski, the President of United); JX 1.[5]

1. *The pre-award meeting with the Air Force.*

In early May 2000, United was invited to come to Luke AFB for a pre-award visit to discuss its proposal.  Tr. 140:2-15 (M. Kaminski).  Michael Kaminski and Robert Kaminski, the

---

[3]The Federal Acquisition Regulations ("FAR") are codified in Title 48 of the Code of Federal Regulations ("C.F.R.").  Citations to Title 48 will be omitted in each subsequent reference to the FAR.

[4]"UL" refers to Underwriters Laboratories, Inc.  *See* JX 44-16 to 31.
 Fire rating is measured on a numeric scale with 0 being the flame spread of cement (non-combustible) and 100 being the flame spread of hardwood flooring material such as red oak.  *See* Tr. 36:8-15 (R. Kaminski), 250:7-23 (Test. of Kenneth McLauchlan, an expert witness testifying on behalf of the government).  To be Class A fire rated, a material must achieve a flame-spread rating of 25 or lower.  Tr. 251:10-11 (McLauchlan).  Class B material has a fire rating from 26 to 75, and Class C has a fire rating from 76 to 200.  *Id*.

[5]Testimony at trial established that the president of another offeror, Allied Modular Building Systems ("Allied Modular"), had assisted Air Force personnel in drafting the Statement of Work.  Tr. 465:13-21 (Test. of Kevin L. Peithman, President of Allied Modular).

President and CFO of United, respectively, attended the meeting with Air Force personnel, including Stanley Janders, the procuring contracting officer, Jeff Kistler, a contracting specialist, and other personnel including the head of electrical engineering, the fire chief, and the manager of the warehouse.  Tr. 140:16 to 141:10 (M. Kaminski).  The group examined an existing modular building at Luke AFB and the Air Force personnel asked Michael and Robert Kaminski whether United's building was similar, and they confirmed it was.  Tr. 141:11-21 (M. Kaminski).  Air Force personnel requested that the walls be hard and durable, so United agreed to use a hardboard substrate rather than the gypsum substrate they had originally proposed, at no extra cost.  Tr. 142:13-23 (M. Kaminski).  Michael Kaminski testified that at this meeting

> when we looked at the existing modular that they had, they asked us if our walls were similar.  I told them that our design we had planned on using was a drywall panel.  They had kicked against the wall [of] the modular they had and said we need something durable, we want it hard like this hardboard.  Can you offer that?  I said that we could.  The next question was was this going to be more expensive?  We told them it was not.  And Mr. Janders said go ahead and add that in.

Tr. 142:13-23 (M. Kaminski).[6]  At the meeting, United agreed to make other changes in their proposal which raised the price of their bid and which were included in the final contract.  *See* Tr. 142:24 to 143:25, 148:6 to 149:4 (M. Kaminski); JX 44-34 (May 11, 2000 quotation of added "options" such as expanded air conditioning capacity and additional windows for $7,408.00); JX 2-2 (contract including added options).

---

[6]In their proposal submitted April 14, 2000, United proposed to build a "modular office 4" system Class A fire rated to include . . . 9' high wall sections."  JX 44-32.  No mention was made in the proposal of what type of material United intended to use as a wall substrate.  JX 44-32 to 33.  Stanley Janders, the procuring contracting officer, signed an affidavit in October 2002 stating that he had "no recollection of any approval regarding any proposed change[] from gypsum to the hard board/polystyrene installed by United Partition[]."  JX 43.  Indeed, later, some Air Force personnel seemed to question why United used hardboard.  *See* JX 3 (letter from Michael Kaminski to Staff Sergeant Brian Milam addressing contract issues by explaining "[t]he wall substrate was changed from vinyl covered Gypsum to vinyl covered Hardboard at the request of everyone at our pre-award site meeting").  In this respect, the court gives credence to Mr. Michael Kaminski's testimony and the contemporaneous documentary evidence and finds that at the pre-award meeting Air Force officials requested something more durable than gypsum wallboard and United agreed to use a hardboard substrate.  *See* Tr. 142:13-23 (M. Kaminski); JX 30-1.  Although this agreement was not memorialized in writing until after the contract was signed, *see* JX 3, the contract did not require the use of a gypsum substrate.  The Statement of Work in the contract merely says "[t]he modular building walls shall be 4" minimum thickness 9' high and shall be Class-A fire rated and shall be UL Approved; color to be selected upon award."  JX 2-3 at ¶ 1.

At the pre-award meeting, the group also discussed the requirement in the solicitation that "modular building walls shall be . . . UL Approved." *See* JX 1-2 at ¶ 1.  United's representatives told Air Force personnel that UL approval did not exist for wall systems, *see* Tr. 138:12-14, 183:15 to 184:24 (M. Kaminski); JX 30-1, because UL does not "approve" products for any particular use.  Tr. 51:22 to 52:2 (R. Kaminski), 185:6-9 (M. Kaminski).[7]  At the time, Air Force personnel indicated this was not an issue.  *See* JX 30.

Further, the Air Force's proposal contained a requirement that electrical wiring, telephone cable, and LAN lines be installed in "UL Approved raceway channels."  JX 1-2 at ¶¶ 4-5.  United did not have a UL-approved raceway channel at that time, nor were they aware of any in their industry.  Tr. 138:15-23 (M. Kaminski); JX 30-2.  At the meeting, United informed Air Force personnel of this fact, and the Air Force personnel indicated it would not be an issue.  Tr. 138:24 to 139:1 (M. Kaminski); JX 30-2.  However, a requirement for "UL Approved raceway channels" was included in the final contract, *see* JX 2-3 at ¶¶ 4-5, and repeatedly arose as an issue throughout the contract period.

United brought samples of vinyl-clad finishes to the pre-award meeting for Air Force personnel to inspect.  Tr. 1503:3-14 (R. Kaminski).  Air Force personnel selected the colors of vinyl that they wanted for the building.  Tr. 105:9-24 (R. Kaminski), 153:3 to 154:2 (M. Kaminski); JX 16.  Although United brought only vinyl samples to the meeting, they had other finishes available if Air Force so desired, such as metal, stucco, and fiberglass.  Tr. 106:11-19 (R. Kaminski).  The Air Force also had the option of installing the raw drywall or hardboard with no finish, which they had done in past dealings with United.  Tr. 105:25 to 106:10 (R. Kaminski).

This was not the first building United had provided to Luke AFB.  United had installed at least four others before this time.  *See* JX 44-98.  One building had vinyl-clad hardboard walls, another had vinyl-clad gypsum wallboard, and a third had stucco-embossed hardboard for exterior use.  Tr. 40:22 to 41:20 (R. Kaminski).  The finishes for these buildings were chosen by Luke AFB and United never received any complaints about the vinyl finishes for these other buildings.  Tr. 41:22 to 42:7 (R. Kaminski).  Nor did Luke AFB ever ask if the vinyl finishes were Class A rated before this project.  Tr. 43:1-14 (R. Kaminski).

---

[7]Underwriters Laboratories, Inc. does not "approve" products and actually forbids the use of the term "UL Approved" in promotional materials and packaging.  *See* JX 44-25.  Instead, it provides "UL Listing, Classification or Component Recognition."  JX 44-20.  "Classification means that UL has tested and evaluated representative samples of [a] product with respect to certain properties of the product," such as "applicable UL requirements and Standards for Safety, as well as to the standards of other national and international organizations such as the NFPA, ASTM, NSF International, ISO and IEC."  JX 44-22.  A competitor, Allied Modular, had a gypsum wall panel that was UL classified.  *See* Tr. 467:1-9 (Peithman).

2.   *The contractual award and initial performance.*

On June 5, 2000, the Air Force awarded Contract No. F02604-00-F-A033 ("Contract") to United for the modular building at a price of $108,404.  Stip. ¶ 2; JX 2.[8]  The Contract required United to deliver the building to Luke AFB by July 31, 2000.  Stip. ¶ 3.  Like the solicitation, the contract required that "[t]he modular building walls shall be 4" minimum thickness 9' high and shall be Class-A fire rated and shall be UL Approved; color to be selected upon award."  JX 2-3 at ¶ 1.  The contract also required that electric wiring, telephone cable, and LAN lines be installed in "UL Approved raceway channels."  JX 2-3 at ¶¶ 4-5.  It further required United to demolish and remove three existing modular offices, one of which had to be removed before United's building could be installed because it occupied the location of the new installation.  *See* JX 2-5 at ¶ 17.

After being awarded the contract, United manufactured the prefabricated components, a process that took approximately four weeks.  Tr. 154:13-17 (M. Kaminski).  In July 2000, United shipped all of the materials needed for the installation to Luke AFB.  Tr. 55:2-10 (R. Kaminski), 154:13-22 (M. Kaminski); JX 21-2 to 4.  United's crew then began the installation.  Tr. 156:7-23 (M. Kaminski).

The wall system that United manufactured and delivered to Luke AFB was made up of 4' x 9' wall panels, *see* Tr. 118:18-22 (R. Kaminski), that were 3 ½" thick, which United advertised as a 4" nominal width (just as a 2x4 board is actually only 3 ½" wide).  *See* Tr. 27:14-20 (R. Kaminski); JX 19-4.  Each panel had a polystyrene board core (an insulation foam) in its center. Tr. 26:9-12 (R. Kaminski).  The foam was not exposed on the wall surface and is a combustible product.  Tr. 26:18-25 (R. Kaminski).  United submitted manufacturer-generated product data on the foam to the Air Force certifying that it was Class A fire rated.  *See* JX 44-52 (specifying flame spread between 10 and 15, below the 25 limit required for Class A materials); Tr. 179:14 to 180:21 (M. Kaminski); JX 8.[9]  The foam core was placed between hardwood substrate panels

---

[8]Although the contract was technically a Delivery Order made under GSA's FSS Contract, the Air Force has made reference to a "Contract" and the court will maintain this usage.

[9]The fire rating of the foam core was disputed at trial.  Michael Kaminski testified that he supplied the Air Force with product specifications for each of the wall components, the documentary evidence for which was admitted as Joint Exhibits 6, 7, and 8.  Tr. 179:14 to 180:4 (M. Kaminski).  Joint Exhibit 8 contains an invoice for an Insulfoam product that does not address its fire rating and probably does not relate to the actual foam used in United's modular building.  *See* Tr. 214:13-18 (M. Kaminski); *see also* Def.'s Post-Trial Br. at 11 n.3.  However, a product specification for 4" Insulfoam is found in Joint Exhibit 44 and verifies that the flame spread is between 10 and 15, making it a Class A product.  JX 44-52.  This is the foam specification that appears to have been provided to the Air Force, which would explain why the Air Force never contemporaneously raised concerns about the foam.  *See* Tr. 180:16-21 (M. Kaminski); JX 30 (Letter from M. Kaminski to Janders) (stating that United provided Luke AFB

made of 1/8" Oro-Bord.  Tr. 27:22 to 28:4 (R. Kaminski).  The manufacturer of this hardwood substrate, L-P Oro-Bord, certified that it was Class A fire rated, and United passed this certification to Luke AFB.  JX 5; Tr. 31:16 to 32:19 (R. Kaminski), Tr. 175:22 to 176:7 (M. Kaminski).  The Oro-Bord hardboard had a vinyl wall covering placed as a wall finish.  Tr. 50:8-9 (R. Kaminski); JX 11.  United did not provide any certification to Luke AFB or GSA that the vinyl wall covering was Class A fire rated, and United was not aware of any Class A fire rated vinyl wall covering used in their industry in 2000 and 2001.  *See* Tr. 42:8-20, 51:4-15 (R. Kaminski), 191:5-10 (M. Kaminski).  United used an adhesive and a resin to attach the foam to the hardboard and the hardboard to the vinyl, and they provided the Air Force with information about these products.  *See* Tr. 179:14 to 180:4 (M. Kaminski); JX 6, 7.  The data sheet for the adhesive product lists its flash point as "[n]oncombustible" but states as an unusual hazard that "[d]ried product can burn."  JX 6-3.  As with the foam, Air Force personnel did not query United about the adhesives used.  Tr. 180:16-21 (M. Kaminski).  The entire wall panel was then encased with aluminum caps on all sides.  Tr. 28:6-10, 44:13-23 (R. Kaminski).  This metal border covered the edges of the panel and extended over the face of the panel by a quarter inch to an inch and a half, such that no hardboard, foam, or resin was exposed.  Tr. 226:17 to 228:1 (M. Kaminski).

United performed the electrical work while its subcontractor installed the telephone and communications system.  Tr. 156:20-23 (M. Kaminski).  At the direction of Air Force, United placed the electrical and telecommunications wiring in the same channel.  Tr. 158:22 to 159:6 (M. Kaminski).  Some Air Force personnel expressed concern during installation that the placement of telecommunications wiring and 110-volt electrical wires within the same conduit might cause interference.  Tr. 157:13-22 (M. Kaminski).  To reduce or eliminate that possibility, United agreed to use a UL-listed electric conduit wrap within the raceway to encase the electrical wiring. Tr. 157:13 to 159:14 (M. Kaminski); JX 3 at ¶ 1; JX 44-101 (Facsimile from M. Kaminski to SSgt. Milam (Aug. 9, 2000)) (stating "please note that in modular construction, UL listed raceways do not exist! . . . UL approved [*sic* - listed] the wire wrap to be used"); JX 44-53 (Mem. by SSgt. Brian Milam (Aug. 14, 2000)) (stating that "Mr. Kaminski also confirmed his proposal to wrap the comm[unication] [l]ines in a protective covering at no additional cost to the government").  At the direction of Michael Meyer, the electrical engineer at Luke AFB, United placed all of the electrical wiring within UL-listed conduit wrap inside their raceway, and was told that this would suffice in lieu of a UL-approved raceway.  Tr. 141:1-2, 185:14-24 (M. Kaminski).

As the modular building was being installed, Air Force personnel also raised concerns with United about the fire rating for the wall system.  Tr. 156:24 to 160:3, 161:9-17 (M. Kaminski); JX 3; JX 26.  Robert Miller, a contracting specialist with the Air Force, sent United a letter on August 11, 2000 requesting that United "provide manufacturers['] specifications which show that the [wall] materials being used have a UL listing for Class A flame spread."  JX 26.

---

"with information on each component which is all Class 'A'").

On August 15, 2000, Michael Kaminski wrote a letter to SSgt. Milam, the contracting officer who had replaced Mr. Tetrault, stating that

> The wall substrate was changed from vinyl covered Gypsum to vinyl covered Hardboard at the request of *everyone* at our pre-award site meeting.  There were 12 - 15 people from Luke AFB including contract personnel, inspectors, advisors, and the end users.  Note also that *all* of the modular buildings seen in the supply warehouse are also of this same construction.  Attached is the requested MSDS report for the wall surface.

JX 3.[10]

Additionally, at the Air Force's recommendation, United hired a subcontractor, Southwest Cable Technologies, to install the phone and internet wiring.  Tr. 166:11-25 (M. Kaminski).  Southwest Cable Technologies completed these installations and sent United 5-year and 15-year guarantees which were forwarded to Luke AFB.  Tr. 167:1-18 (M. Kaminski); JX 21-6 to 7.

By mid-August, the installation was nearly complete.  All that remained was installation of two HVAC units and carpeting, plus removal of two extraneous modular buildings.  Tr. 58:8-14 (R. Kaminski), 170:7-13 (M. Kaminski).  United could not remove the two buildings until the personnel housed in those buildings moved into the new modular building.  *See* Tr. 208:2 to 209:20 (M. Kaminski); *see also* Tr. 202:4-8 (M. Kaminski).  United also installed cable and telephone runs outside the modular building that remain in place today.  Tr. 60:2-19 (R. Kaminski); JX 23-2 to 3.

On approximately August 18, 2000, United stopped work on the project and its installers left the warehouse after having been asked to leave by Air Force personnel.  JX 34 (Letter from M. Kaminski to Luke AFB responding to Show Cause Notice (July 12, 2001)),  United advised that it could not install the HVAC units until Air Force removed some swamp coolers, which the Air Force never did; after United left, they were not invited back to complete the project.  *Id.* (stating: "Luke AFB halted completion of this project on 18 Aug[.] 2000 when they sent our installers home.  The HVAC system was set for completion that week, but Luke AFB had to

_____

[10]An MSDS is a "Material Safety Data Sheet."  Tr. 161:20-22 (M. Kaminski).  The MSDS cited in this letter is not among the exhibits, and Michael and Robert Kaminski both indicated that they were not aware of any vinyl finish in 2000 or 2001 that was Class A fire rated.  *See* Tr. 42:17-20, 51:4-15 (R. Kaminski), 191:5-10 (M. Kaminski).  Consequently, the court finds that the missing MSDS did not certify that the vinyl was Class A rated but rather that its actual fire rating was unknown to all parties involved.  As noted previously, United did provide Luke AFB with specifications for the hardboard that it used in its wall system.  *See* Tr. 175:22 to 176:7 (M. Kaminski); JX 5-1.  The specification, from the L-P Oro-Bord company, stated that "[f]ire retardant Oro-Bord is certified as [C]lass 1A by Underwriters Labor[atory.]" JX 5-1.

resolve issues with respect to existing swamp coolers."). Mr. Janders had "a vague recollection regarding the removal of the swamp coolers" but maintained that the HVAC units should have been installed on top of the modular building and vented out of the warehouse, in which case the swamp coolers didn't need to be removed. *See* JX 43 ("The statement of requirements state[s] [that] HVAC was to be roof mounted on the modular office and be vented outside of the warehouse area."). However, this interpretation of the contract was erroneous; the statement of work in the contract actually provided that the HVAC "[c]ondensing units [should] be located outside the exterior warehouse walls." JX 2-6. This contractual language reflected the parties' prior agreement; at the pre-award meeting, Air Force personnel had directed United to install the HVAC units outside the warehouse wall where some swamp coolers were located, which coolers the Air Force said would be removed before United began installation. Tr. 168:12-25 (M. Kaminski). The Air Force's failure to remove the swamp coolers appeared to be due to an internal failure to determine who at Luke AFB was responsible for removing the coolers. Tr. 169:1-17 (M. Kaminski). In an attempt to resolve the swamp-cooler issue, on August 23, 2000, United submitted a bid to Air Force to assist in the removal and disposal of the coolers by disconnecting the power and duct work. JX 19-6; JX 44-74. The government never responded. Tr. 170:18-22 (M. Kaminski).

On August 22, 2000, a teleconference was held between Michael Kaminski and Air Force personnel, including Michael Meyer. JX 44-69 to 70; Tr. 178:4-12 (M. Kaminski). At that meeting, the participants again discussed the issue of United's not having a UL-approved raceway. Tr. 178:16-24 (M. Kaminski). Mr. Kaminski reiterated the solution that had been reached earlier to use the UL-listed wrap for the electric cabling. Tr. 178:25 to 179:12 (M. Kaminski).

Subsequently, Robert Kaminski and Contracting Officer Robert Kelley had a telephone conversation about United's being paid on the project, during which Mr. Kelley indicated that if Mr. Kaminski sent him an invoice, "he would see about processing payment." Tr. 62:4-14 (R. Kaminski). On September 19, 2000, Robert Kaminski sent Mr. Kelley a letter invoicing Luke AFB for 90 percent of the contract price, $97,563.60. JX 24. In United's industry, standard practice calls for the contractor to bill for 90 percent of a project once tentative, substantial completion had been reached, with the last 10 percent to be paid after the principal submits a punch list and the contractor completes the items on the punch list. Tr. 63:19-25 (R. Kaminski). United was never paid anything. Stip. ¶ 10.

On September 13, 2000, SSgt. Milam received a letter from Kevin Peithman, the President of Allied Modular, a competitor of United, in which Mr. Peithman criticized the workmanship on the building. PX 1.[11] In his letter to SSgt. Milam, Mr. Peithman listed a number of alleged defects, including that the wall system and raceways were not UL Approved,

---

[11]Mr. Peithman had previously worked for United, *see* Tr. 54:1-10 (R. Kaminski), but left after disagreements arose, Tr. 452:17 to 453:3 (Peithman), and formed his own competing company using essentially the same modular-building technology. Tr. 54:1-24 (R. Kaminski).

that the hardboard being used was not Class A fire rated, and that the use of data and electrical wiring in the same raceway was prohibited.  *Id*.  Mr. Peithman intimated that the reason United won the bid was because they cut costs through shoddy workmanship and that they had failed to satisfy all the contract specifications.  *Id*.  He called on SSgt. Milam either to "compel [United] to comply with the entire scope of specifications and work . . . requirements" or to "find the contractor in default . . . and award this project to the next lowest bidder," which happened to be Allied Modular.  *Id*.  Mr. Peithman offered to complete the project at the same price it was awarded to United.  *Id*.

   3.  *The Air Force's Cure Notice.*

   On October 12, 2000, Robert Kelley, the contracting officer who had replaced Mr. Janders, supposedly sent United a letter with a series of photographs identifying defects in the installation that required "correction before acceptance, and before final payment can be processed."  JX 22 (photos cataloging defects in the installation including dents, gaps, scratches, misalignments, and leaks).  United avers it never received these photographs or any other punch list from Luke AFB.  *See* Tr. 57:13 to 58:7 (R. Kaminski).  Mr. Janders testified initially that United was provided with a punch list, *see* Tr. 516:17 to 517:10 (Janders), although he could not identify from memory the form of that punch list or when it was conveyed to United.  *See* Tr. 540:7 to 541:21 (Janders).  He also did not know if United was given access to Luke AFB to remedy the items in the letter sent October 12, 2000.  Tr. 543:13 to 544:2 (Janders).

   On November 28, 2000, Mr. Janders, who had again become the Luke AFB contracting officer, sent United a Cure Notice stating that United had failed to comply with material requirements in the Statement of Work.  JX 29.  Mr. Janders claimed that United had not provided adequate evidence "that the wall system used for [the] project [was] '[C]lass A fire rated and UL approved.'"  *Id*.  He also averred that United "failed  to comply with the requirement to provide 'UL approved raceway channels' as required by the statement of work."  *Id*.  Finally, he warned that "unless the conditions . . . are cured within 30 days after receipt of this notice, the [g]overnment may terminate for default under the terms and conditions of this contract."  *Id*.

   On January 11, 2001, Michael Kaminski responded to Mr. Janders's letter of November 28, 2000, specifically addressing the issues of Class A fire rating and UL approval for the wall system.  JX 30.  He reminded Mr. Janders that at the pre-award site visit, United had "openly expressed that there was not a UL approval on our panel," that United "had never heard of 'UL' being associated with non-electrical components" and that "this was not an issue for anyone."  JX 30-1.  He also wrote that "United has provided you with information on each component which is all Class 'A'.  It would be an oxymoron to present that all Class 'A' components provided together would provide you with an end result of less than Class 'A' Rating.  In doing so, we have provided you with all information you have requested."  *Id*.  Mr. Kaminski also voiced frustration that the issue of UL approval for the raceway channel continued to arise:

Once again, we told everyone . . . on our site visit . . . that we were unaware of any UL approval existing on a raceway in our industry.  Thus, we did not have a UL approval, and this was not an issue for anyone.

Regardless, your base civil engineer said he would accept our raceway without the UL listing if we utilized UL electrical conduit to house wires within our raceway.  Due to this, we felt that the raceway issue was resolved.

JX 30:2.[12]

On May 7, 2001, Deputy Flight Chief MSgt. Bernard Clemens conversed with Michael Kaminski about the fire safety of the wall system.  *See* JX 11.  That same day he sent Mr. Kaminski a letter stating that the fire rating of the vinyl covering was their only major concern.  JX 10.  He asked that United "provide literature on the vinyl covering rating and all paperwork that associates the literature to the [C]lass A rating of the covering."  *Id*.  He asserted that if this issue were resolved, Luke AFB fire chief Rob Smith would approve the building walls as Class A fire rated and the project could continue as planned.  *Id*.

Michael Kaminski responded to MSgt. Clemens's May 7 letter via a letter sent May 9, 2001, in which he expressed confusion:  "Our discussion on the phone [the morning of May 7, 2001] was solely in reference to the [Oro-Bord] documentation that you were provided.  Your letter though, talks about vinyl.  Which material is in question?  What exactly are you looking for?  Also, in our conversation you mentioned that the U.L. issue is resolved.  There wasn't a note of that in the letter."  JX 44-66.

In a responsive letter on May 9, 2001, after speaking with the "Fire Protection Office folks" at Luke AFB, MSgt. Clemens wrote to Mr. Kaminski that the fire rating of the vinyl was the only issue to resolve before work could continue, and that "U.L. approval will not be an issue as soon as it is determined that the vinyl is Class 'A' rated."  JX 11.

United then contacted MSgt. Clemens by telephone to object to the Air Force's taking issue with the vinyl wall covering.  JX 44-75.  United insisted that no Class A rated vinyl wall covering or vinyl-clad finish was available, and that all of the modular buildings on Luke AFB and other bases used the same vinyl finish that United used.  *Id*.  United argued that the fire rating of a wall does not include its wall covering, saying "if you take a concrete wall, a general construction wall or a modular wall and apply a wall covering, it does not change the fire rating of the wall."  *Id*.  MSgt. Clemens responded "that is not the same thing."  *Id*.

---

[12]In a further attempt to resolve this issue, United sought and obtained UL classification for their composite panel system, signifying that UL accepted "running electrical wiring and phone and data wiring within the raceway channel without the requirement for further conduit" as was done on the Luke AFB project.  Tr. 210:11 to 211:3 (M. Kaminski).  United obtained the UL classification in early 2001 prior to termination.  Tr. 211:4-13 (M. Kaminski).

B. *The Air Force's Termination of the Contract and Reprocurement*

1. *The termination.*

At some point in mid-June 2001, Michael Meyer sent an internal e-mail to Lieutenant Colonel Phillip Triplett, the acting commander at Luke AFB, stating that he had met with Chief Smith and Captain Michael Hatton and that "[t]he contractor will have to have the wall system tested by a certified testing lab.  If the wall passes, the contractor will probably be given the chance to finish the building."  JX 44-67.  The Air Force did not have the panel tested at that time.  Tr. 535:18 to 536:3 (Janders).  They also did not direct United to have the wall system tested by a certified testing laboratory, although a suggestion had been made to United to do so in late 2000 or early 2001.  Tr. 538:13 to 539:6 (Janders).

On June 25, 2001, Robert Kelley, the contracting officer at that time, sent United a Show Cause Notice stating that United had failed to cure the conditions identified in the Cure Notice issued on November 28, 2000, *see* JX 29, and those reflected in MSgt. Clemens's letter of May 9, 2001, *see* JX 11, and that the government was considering terminating the contract.  JX 32.  In the Notice, Mr. Kelley stated that "[p]ending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part."  *Id.*  The letter advised United that it was being given ten days to present in writing any facts bearing on this determination, and that a failure to present any excuses within this time could be considered an admission that none exist.  *Id.*  A conference call was held on July 3, 2001 which included Michael Kaminski, Robert Kelley, and MSgt. Clemens, but no resolution was reached.  *See* JX 33.

Michael Kaminski responded in writing to the Show Cause Notice on July 5, 2001, reiterating United's position, as previously presented in his letter of January 11, 2001 to Mr. Janders (*see* JX 30), that "United Partition has and will maintain that materials supplied are an equal to the satisfactions [sic] for [the] contract."  JX 33.  He sent another letter on July 12, 2001, again attributing the non-completion of the contract "to the actions, or lack there[]of, on the part of Luke AFB."  JX 34.  He again asserted that Luke AFB personnel "approved all materials and design by United Partition Systems during an on-site meeting held with 12-15 people in attendance."  *Id.*

On July 24, 2001, Sue Kaminski, United's Vice President, wrote a letter to Brigadier General (Select) Steven T. Sargeant seeking a resolution of the matter.  JX 44-73 to 76, Tr. 196:17 to 197:5 (M. Kaminski).  She presented United's version of events, together with exhibits, recounting what had happened up to that point in time.  JX 44-73 to 76.  She attributed the cessation of work back in August 2001 to Luke AFB's failure to resolve the issue of removing the swamp coolers and SSgt. Milam's having sent their installers home.  JX 44-74.  She reiterated United's position that the vinyl wall covering did not need to be Class A because it was not part of the wall system and that the vinyl covering had been selected by the Air Force. JX 44-75.

Robert Kelley, who was then the contracting officer, wrote United on August 20, 2001, informing them "that Contract F02604-00-FA033 is being terminated in accordance with [GSA] [C]ontract clause 52.249-8 titled Termination for Default." JX 27-1 at ¶ 1.  The letter stated that United's "response to the Show Cause Notice [of June 25, 2001] was determined to be inadequate." JX 27-1 at ¶ 2.  Mr. Kelley then went on to list "some, but not all," of the purported defects with the modular building supplied by United, including that "[t]he hardboard [used for the walls] is a highly flammable product produced with formaldehyde.  This does not meet the Class 'A' fire rating as specified by the contract." JX 27-1 at ¶ 3.[13]  The letter instructed United that it had "thirty days from receipt of the termination for default to remove all supplies and equipment provide[d] by your firm from Luke AFB, AZ." JX 27:1 at ¶ 1.

Michael Kaminski testified that neither he nor anyone else at United saw this letter until December 2001, approximately four months after it was issued.  Tr. 197:15 to 198:15 (M. Kaminski).  However, Mr. Janders testified that the letter was sent to United.  Tr. 494:20-24 (Janders).  He testified as the custodian of the contract file that a return receipt is on file for this document and that Vanessa Miller at United signed for the document in September 2001.  Tr. 494:5 to 495:20 (Janders).  The court finds that the letter was mailed to and received by United, but makes no finding as to whom at United may have seen the letter upon receipt.

On September 14, 2001, Robert Kelley, the contracting officer at that time, issued a signed Amendment of Solicitation/Modification of Contract purporting "to terminate this order [Contract F02604-00-F-A033] for default" and indicating that the Air Force would pay United nothing.  JX 28-1.  United received a copy of this Amendment of Solicitation/Modification of Contract in timely fashion.  Tr. 200:1-8 (M. Kaminski).  However, the Amendment gave no reasons for the contract termination nor any direction that United remove the materials at Luke AFB.  JX 28.

Sometime between September 14, 2001 and December 12, 2001, the United modular building was dismantled and stored in the same warehouse, Building 945, on Luke AFB.  Tr. 65:3-8 (R. Kaminski).[14]

---

[13]Mr. Kelley's letter does not set forth the basis on which he concluded that the hardboard was highly flammable or made with formaldehyde.  At trial Mr. Janders testified that he believed that the manufacturer's literature contained that information.  Tr. 515:1-14 (Janders).  However, the specifications for Oro-Bord that were sent to Luke AFB by United do not mention formaldehyde and state that the hardboard is "[C]lass 1A."  *See* JX 5-1.  Whether the hardboard contained formaldehyde is immaterial to this case; formaldehyde was a permitted product in California at that time and nothing in the GSA contract or Luke AFB contract prohibited its use. *See* Tr. 482:3-14 (Peithman), 515:1-16 (Janders); JX 2; JX 4.

[14]The United building was dismantled by workers for Allied Modular, who were hired by Air Force to deliver and install a replacement building.  *See* Tr. 434:23 to 435:3 (Peithman); Tr. 501:3-16 (Janders).

13

On December 12, 2001, Robert Kelley, as the contracting officer, wrote another letter to United, stating that he had issued the termination for default on September 14, 2001, and had requested at that time that United dismantle and remove the modular building within 30 days.  JX 37.  He advised that "[a]s of the date of this letter United Partition[] Systems has failed to either acknowledge or comply with this request.  As part of the reprocurement process, authorized under the Federal Acquisition Regulation, the modular building in question has been disassembled and is currently being stored by the [g]overnment."  *Id.*  Mr. Kelley gave United fifteen days to "provide the [g]overnment with disposition instructions on the modular building," absent which the government would dispose of it "through normal [g]overnment procedures and channels."  *Id.*

United responded through its attorney, Paul Dauer, on December 18, 2001, asserting that the government had never directed United to dismantle and remove the modular building or take any other action with regard to the terminated contract.  JX 38.  Mr. Dauer also stated that "any attempt on behalf of the government to dispose of the modular building, as indicated in [Mr. Kelley's] December 12, 2001 letter, would amount to destroying evidence."  JX 38-1.  He warned that if the government did not "cease any actions to dispose of or modify the modular building, . . . [United would] move for sanctions against it in any proceeding brought concerning [the contract] as a result of the government's spoliation of evidence."  JX 38-2.

On January 25, 2002, United filed a certified claim for $108,404.  Stip. ¶ 13.  On May 20, 2002, the Air Force contracting officer denied United's claim of $108,404 and asserted a claim for excess reprocurement costs in the amount of $10,987.50, "representing the cost of removal of two other structures in the area of the building which were to be removed as part of United's original work scope."  Stip. ¶¶ 14-15.[15]

  2. *Another contractor's installation of a replacement building.*

In August or September 2001, Luke AFB entered into a contract with Allied Modular "under which Allied Modular would furnish a building of its manufacture to replace the United building."  Stip. ¶ 17.   "The amount of the [c]ontract for the Allied building was the same as the full contract price of the United contract, $108,404."  Stip.  ¶ 18.

Allied Modular installed a new modular building with a vinyl-clad gypsum wall system.  Tr: 451:20-24 (Peithman).  They did not provide the Air Force with verification of whether the vinyl finish was Class A fire rated, and no one at the Air Force requested such information.  *See* Tr. 459:17 to 460:10 (Peithman).  Allied Modular also used a number of United's materials in its building.  *See* JX 40.

_____

[15]"The amount of the [g]overnment['s] claim for excess reprocurement is now $7,987.50."  Stip. ¶ 15.

14

On March 20, 2002, Mr. Peithman of Allied Modular sent Luke AFB a letter purporting to list all of the items that it used from the United project. JX 40; Tr. 435:20 to 436:4 (Peithman). Allied Modular's quote to Luke AFB for the building had included deductions for United materials it intended to use in construction. *See* JX 20-5. These materials included a transformer, LAN conduit, two high-impact doors, and insulation. *Id*. Mr. Peithman's subsequent listing of United's materials used by Allied Modular included the items from Allied Modular's quote, except for insulation, but also included two sub panels, telephone and electrical conduit, and carpet. JX 40.

In April 2008, United conducted an inventory of the remaining materials from its modular building that were being stored in the larger warehouse. Tr. 65:13 to 66:10 (R. Kaminski). Robert and Michael Kaminski went to Luke AFB and took a physical inventory of the United materials still stored by the Air Force. Tr. 65:9-21 (R. Kaminski); JX 14. Many of the items were either damaged or missing. Tr. 66:14 to 70:18 (R. Kaminski).

After inventorying the items in the large warehouse, Robert and Michael Kaminski inspected the building that Allied Modular installed to see if some of United's materials had been used in construction. Tr. 71:10 to 72:1 (R. Kaminski). Robert Kaminski testified that the following materials were not in their inventory pile but had been installed inside or on the exterior of the Allied Modular building: exit signs; LAN lines; a thermostat; LAN conduit; electrical conduit; an electrical box; an electrical panel with breakers; sprinkler connections; sprinkler heads; a strobe and fire alarm; and high-impact doors. Tr. 71:4 to 79:20 (R. Kaminski); JX 15. It is United's contention that these items were either taken from their building and used in the new building constructed by Allied Modular or, in the case of the exterior items like the conduits and electrical box, had been originally installed by United and kept in continuous use by Luke AFB. Tr. 82:24 to 83:5 (R. Kaminski); JX 17.

3. *United's subsequent presentation of its cost of materials.*

Robert Kaminski prepared a list of items that United shipped to Luke AFB which were either missing or damaged when he did the inventory. JX 17; Tr. 85:3 to 86:2 (R. Kaminski). Mr. Kaminski assigned a price to each of the items based on a GSA price list and the government order from Luke AFB. Tr. 86:7-13 (R. Kaminski).

4. *Belated testing of United's prefabricated wall units.*

At trial, the government adduced expert testimony from Kenneth McLauchlan, the Senior Mechanical Engineer and President of McLauchlan & Associates, which performs forensic engineering and indoor air quality analysis. Tr. 244:25 to 245:12 (McLauchlan). Mr. McLauchlan was retained by the government for purposes of this litigation to determine the flame spread class of the United modular wall system and submitted an expert report dated June 25, 2007. JX 47-1 to 4; Tr. 248:4-20 (McLauchlan). The court qualified him "as an expert in flame spread testing." Tr. 282:14-15.

McLauchlan hired Guardian Fire Testing Laboratories, Inc. to conduct the actual testing. JX 47-2.[16]  Guardian performed its testing "in accordance with ASTM E-84, Standard Test Method for Surface Burning Characteristics of Building Materials." *Id*.[17]  Guardian first performed a pre-test by applying a flame to a 24" by 24" sample of the partition material.  *Id*. "The pre[-]test indicated that . . . within 10 seconds of the application of the flame to the surface of the composite wall, there was flame, and then, within two minutes of the application of the flame, a crack had formed in the surface above the heat source so that the outer surface, the vinyl and the hardboard, had been completely penetrated at that point by the flame."  Tr. 409:2-11 (McLauchlan).

Guardian then performed a full "Steiner Tunnel Fire Test."  Tr. 409:12-15 (McLauchlan). It placed six sections of 24" by 48" wall partition material along a metal rack, each section butted up against the other, to create a 24' by 2' set of sections of material.  Tr. 409:12-19 (McLauchlan); JX 47-2. The wall panels were tested with the vinyl finish still attached but without the aluminum caps.  *See* Tr. 422:9 to 423:20 (McLauchlan).[18]  Guardian then turned on gas burners to ignite the test material from below and monitored the progression of the flame front over time.  JX 47-2; Tr. 250:7-15 (McLauchlan).  The sample was found to have a Flame Spread Index rating of 195, a Class C rating (*i.e.*, having a Flame Spread Index greater than or equal to 76 but less than or equal to 200).  JX 47-3.  Mr. McLauchlan concluded that "[t]he partition wall panel material provided by United Partitions does not comply with Class A construction requirements."  JX 47-3.[19]

---

[16]Guardian "is accredited as a fire testing laboratory under ISO 17025-2005, 'General Requirements For The Competence Of Testing And Calibration Laboratories.'"  JX 47-2.

[17]ASTM refers to the American Society for Testing and Materials.  Tr. 248:21-23 (McLauchlan).

[18]The government had wall material tested without the vinyl, but the government did not present evidence of that test at trial.  *See* Tr. 20:23 to 21:4 (government's opening statement).

[19]United does not dispute the result of the test.  *See* Stip. ¶ 16.  However, United disagrees with the conclusions being drawn from the results, namely that the test shows that the "wall system" is not Class A fire rated.  Pl.'s Post-Trial Br. at 20.  United argues that the panels should have been tested without the vinyl covering, contending that the vinyl finish should not be considered part of the wall system for purposes of a fire rating.  *See* JX 44-73 to 76.  Also, United points out that the tested sections were cut from larger panels and placed for the flame test such that they did not fit tightly against each other, thus allowing the flame to come up through the junctions, presumably at which point the flame would spread more quickly.  *See* Pl.'s Post-Trial Br. at 20-21; Tr. 270:17-19 (McLauchlan) (testifying that he could "see that possibly happening").  Additionally, United contends that the wall sections should have been tested with the aluminum caps present when installed in the Building.  Pl.'s Post-Trial Br. at 21.

## STANDARDS FOR DECISION

Although a contracting officer has broad discretion to terminate a contract for default, *see Lanterman v. United States*, 75 Fed. Cl. 731, 733 (2007) (citing *Consolidated Indus., Inc. v. United States*, 195 F.3d 1341, 1343 (Fed. Cir. 1999)), a termination for default is "a drastic sanction . . . which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J. D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (internal quotation marks omitted)). The government bears the burden of proof as to "the correctness of its actions in terminating a contractor for default." *Lisbon Contractors*, 828 F.2d at 764; *see also McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1351 (Fed. Cir. 2009) (citing *Lisbon* for its holding that "the government bears the burden of justifying the propriety of a default termination").

The procedural requirements for default termination are specified in the GSA Contract and the FAR. Under the FSS program at the time, a contracting agency simultaneously shared contracting authority with the GSA schedule contracting officer. Each officer had continuing authority and responsibilities which could arise during the course of a contract. Of relevance to this case are two clauses which, at the time of this contract, were present within FAR Subpart 8.4, which applies to all Federal Supply Schedule contracts. *See* FAR § 8.402 (1999). The "Termination for Default" provision stated: "An ordering office may terminate any one or more orders for default . . . . The [GSA] schedule contracting office shall be notified of all cases where an ordering office has declared a . . . contractor in default . . . .  Should the contractor claim that the failure was excusable, the ordering office shall promptly refer the matter to the schedule contracting office." FAR § 8.405-5(a)(1)-(2) (1999). The "Disputes" clause stated: "The ordering office shall refer all unresolved disputes under orders to the schedule contracting office for action under the Disputes clause of the contract." FAR § 8.405-7 (1999).[20]

The GSA Contract also contains a "Default" clause which mandated referral to the GSA scheduling contracting officer under certain circumstances. *See* JX 4-45. Under this clause, the

---

[20]Shortly after the operative events in this case, the FAR regulations governing termination for default were amended. The "Disputes" clause was amended in 2002 to make referral of disputes to the schedule contracting office discretionary except for "disputes that relate to the contract terms and conditions[,]" which must still be referred "to the schedule contracting officer for resolution." FAR § 8.405-7 (2002) (subsequently amended and renumbered as FAR § 8.406-6, *see* 69 Fed. Reg. 34,241, 34,248 (June 18, 2004)). The "Termination for Default" clause was amended in 2004 (and renamed "Termination for Cause") to provide that an ordering agency contracting officer may terminate individual orders for cause, with notice to the schedule contracting office. *See* FAR § 8.406-4 (2004) (renumbered from § 8.405-5, *see* 69 Fed. Reg. at 34,248). If the contractor claims that the failure was excusable, the ordering activity's contracting officer is to follow the procedure under the Disputes clause. *Id*.

ordering officer was empowered to "exercise the same right of termination" as the GSA contracting officer, with the important exception "that when failure to deliver articles or services is alleged by the [c]ontractor to be excusable, the determination of whether the failure is excusable shall be made only by the Contracting Officer of the General Services Administration, to whom such allegation shall be referred by the ordering office and from whose determination appeal may be taken . . . ." JX 4-45.

The GSA Contract also specifically addressed the remedy should a contract be improperly terminated. *See* JX 4-9, ("Contract Terms and Conditions - Commercial Items") (incorporating FAR § 52.212-4 (1999)). Under paragraph (m), titled "Termination for Cause," it stated: "If it is determined that the [g]overnment improperly terminated this contract for default, such termination shall be deemed a termination for convenience." JX 4-10. However, it is not enough simply to claim that a termination is "improper" because the wrong contracting officer issued the termination. For a default termination to be converted to a termination for convenience on the basis of procedural error, the contractor bears the burden to show that it was harmed or prejudiced by the government's error. *See BrearingPoint, Inc., v. United States*, 82 Fed. Cl. 181, 183-84 (2008). *Compare International Tel. & Tel. Corp. v. United States*, 509 F.2d 541 (Ct. Cl. 1975) (contractor prevented from curing defects when government failed to issue required cure notice), *and DeVito v. United States*, 413 F.2d 1147 (Ct. Ct. 1969) (government, by failing to terminate contract within reasonable time, waived delivery schedule), *with State of Fla., Dep't of Ins. v. United States*, 81 F.3d 1093, 1098 (Fed. Cir. 1996) (government's failure to notify contractor of appeal rights found to be harmless error), *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996) (government's failure to consider all default termination factors does not require conversion into a termination for convenience), *and Philadelphia Regent Builders, Inc. v. United States*, 634 F.2d 569, 572-73 (Ct. Cl. 1980) (default notice lacking proper contract number and date, failing to state that the notice constituted a decision under the Disputes clause, and lacking a contracting officer's signature, found to be harmless technical defects).

Damages awardable to a contractor whose contract has been terminated by the government for convenience are governed by the FAR and the GSA Contract. *See* FAR § 52.249-2 (1999) (incorporated into GSA Contract by reference, *see* JX 4-76). The contractor is entitled to damages in the amount of the cost of contract work performed before the termination, plus a fair and reasonable profit on the work performed. *See* FAR § 52.249-2, Alternate III(g)(1) (1999). The plaintiff bears the burden of proof to establish termination-for-convenience damages. *See Lisbon Contractors*, 828 F.2d at 767 ("[T]he claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation.") (quoting *Willems Indus., Inc. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961)) (internal quotation marks omitted); *Jacobs Eng'g Group, Inc. v. United States*, 75 Fed. Cl. 752, 759 (2007).

Limits on a contractor's recovery may arise under the so-called constructive-termination-for-convenience doctrine. *See John Reiner & Co. v. United States*, 325 F.2d 438 (Ct. Cl. 1963);

A/S *Dampskibssetskabet Torm v. United States*, 64 F. Supp. 2d 298, 311-13 (S.D.N.Y. 1999).  It is fundamental "that one whose government contract is terminated may not recover more than would have been available if the government exercised all of the rights available to it, irrespective of any errors of omissions by the government contracting officer."  *Torm*, 64 F. Supp. 2d at 313 (citing *College Point Boat Corp. v. United States*, 267 U.S. 12 (1925)).

A contractor's claim where a termination for convenience has occurred may be further reduced by "[a]ny claim which the [g]overnment has against the [c]ontractor under this contract." FAR § 52.249-2(k)(2) (1999).  However, the government may not prevail on a claim against a contractor where the government wrongfully prevented performance by the contractor.  *See Short Bros., PLC v. United States*, 65 Fed. Cl. 695, 799 (2005) (the "implied duty not to hinder performance prohibits the [g]overnment, as with any other party to a contract, from do[ing] anything to prevent performance thereof by the [contractor] or that will hinder or delay him in its performance") (quoting *Lewis-Nicholson, Inc. v. United States*, 550 F.2d 26, 32 (Ct. Cl. 1977)) (internal quotation marks omitted); *Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665, 672 (2004) ("occurrence of a necessary condition [in a contract] 'may be excused by prevention or hindrance of its occurrence through a breach of the duty of good faith and fair dealing'" (quoting *Restatement (Second) of Contracts* § 225 cmt. b (1981)); *see also Petrofsky v. United States*, 616 F.2d 497 (Ct. Cl. 1980); *Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, 402 F. Supp. 2d 198, 202 (D.D.C. 2005) (hindrance or prevention of performance is a breach of contract); *A.I.C. Ltd. v. Mapco Petroleum Inc.*, 711 F. Supp. 1230, 1238 (D. Del. 1989) ("The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party *wrongfully prevented* performance of that condition precedent." (citation omitted)); 5 *Williston on Contracts* § 677A, at 234 (3d ed. 1961) ("justice . . . precludes a promisor from taking advantage of a condition, the performance of which he himself prevented.").

## ANALYSIS

### I. TERMINATION FOR CAUSE

To reiterate the key legal point in this case, at the time the Air Force and United were addressing United's performance, where a contracting officer sought to terminate a contract for default and a contractor raised an excusability defense, the contracting officer had an obligation promptly to refer the matter to the pertinent GSA contracting officer who was responsible for making the determination as to whether the failure was excusable.  *See* FAR § 8.405-5(a)(1)-(2) (1999) ("Termination for Default" clause); JX 4-45 ("Default" clause).  Despite the prior rulings of the Armed Services Board of Contract Appeals and this court that United had raised an excusability defense that was improperly addressed by the Air Force's contracting officer, *see United Partition*, ASBCA Nos. 53915, 53916, 2003 WL 2012838; *United Partition*, 59 Fed. Cl. at 636, the government argues that United did not raise an excusability defense prior to the termination for default.  *See* Def.'s Post-Trial Br. at 14-16 (arguing that all United did was "reiterate[] its position that the materials used met the [wall-system] Class A requirement").  This

effort to obtain reconsideration and reversal of the prior rulings is unavailing.  As the court observed in its earlier decision, United uniformly contended that its "failure to complete [the contract] was due to the actions, or lack thereof, of Luke AFB."  *United Partition*, 59 Fed. Cl. at 641 (internal quotation marks omitted) (citation omitted).  For example, in responding to the Show Cause Notice, Michael Kaminski wrote that "[t]he reason for the non-completion of [the] contract . . . is solely due to the actions, or lack thereof, on the part of Luke AFB."  JX 34; *see also* JX 30 (Letter from Michael Kaminski to Janders (Jan. 11, 2001)) (stating that defects alleged in Cure Notice were excusable); JX 33 (Letter from Michael Kaminski to Luke AFB (July 5, 2001)) (stating that the "materials supplied are an equal to the satisfactions [sic] for [the] contract"); JX 44-73 to 76 (Letter from Sue Kaminski to Luke AFB Brigadier General (Select) Steven Sargeant (July 24, 2001)) (attributing United's non-completion of the project to the Air Force's actions).  Under applicable law, "'acts of the [g]overnment in either its sovereign or contractual capacity' may form the basis for concluding that a contractor's alleged default was excusable."  *United Partition*, 59 Fed. Cl. at 641 (quoting FAR § 52.249-10(b)(1)(ii) (1999)).[21]

Moreover, there is no question but that United was prejudiced by the Air Force's error in making the default termination.  The Air Force directed United to leave the construction site on August 18, 2000, at a time when United had substantially completed construction.  *See* Tr. 170:7-13 (M. Kaminski); JX 34.  United was never invited back to complete work or cure any alleged defects.  *See* Tr. 171:7-22 (M. Kaminski); JX 34.  The matter was not referred to the GSA office for a decision on United's excusability defenses until 2003, approximately two years after September 2001, when the Air Force had acted to terminate United's contract.  *See United Partition*, 59 Fed. Cl. at 632.  By the time of the referral to GSA, the Air Force had already contracted with Allied Modular to dismantle United's building and install a replacement building.  *See* Stip. ¶ 17; Tr. 434:23 to 435:8 (Peithman).[22]  Had the matter been promptly

---

[21]Stanley Janders and Robert Kelley, the contracting officers during the relevant time, appear to have consulted with GSA sometime in 2000 or 2001 about the issues that arose between the Air Force and United.  *See* Tr. 537:6 to 538:7 (Janders).  However, no evidence indicates the content of these consultations.  *See* Tr. 538:8-12 (Janders).  The matter was then not referred to GSA, nor did a GSA contracting officer make a timely determination as to whether United's alleged default was excusable.  Mere consultation does not satisfy the requirements of the contract.  Therefore, the Air Force acted improperly when Mr. Kelley terminated the contract for default without referring the matter to GSA to resolve the issue of United's excusability defense.

[22]The role of Allied Modular in this case is troubling.  Mr. Peithman, who helped draft the terms of the contract, *see* Tr. 465:13-15 (Peithman), inserted himself into the dispute between the Air Force and United by criticizing the workmanship of United's building, alleging contractual violations, and encouraging the Air Force to terminate United's contract and instead award the contract to Allied Modular.  *See* PX 1.  Were this a contract between private parties, United might have a claim against Allied Modular for tortious interference with a contractual relationship.

20

referred to GSA's contracting officer for a determination regarding United's excusability defenses, United might have had the opportunity to cure any defects and complete the contract even if GSA's contracting officer had ruled against United.

Additionally, involving GSA's contracting officer on a contemporaneous basis may have helped clarify the outstanding issues over United's work under the contract.  The government alleges there was no harm to United because United was on notice that the "contract was being terminated because the building it provided did not meet the Class A fire rating required by the contract."  Def.'s Post-Trial Br. at 18.  However, no fire-rating tests of the wall panels were conducted prior to the termination, and United could have acted to replace the wall panels if a test had shown them to be noncompliant with a Class A criterion.  Furthermore, the Air Force's position as to the fire rating of the wall panels was far from consistent; the Show Cause Notice referred to a letter dated May 9, 2001 that indicated that the fire rating of the vinyl wall covering was "the only requirement [that] needed to be resolved before work can continue," JX 11, but in the letter informing United of the decision to terminate, the Air Force asserted that the hardboard was "highly flammable" and caused the wall system to not satisfy the Class A fire-rating criterion (despite the manufacturer's representations to the contrary, *see* JX 5; Tr. 31:16 to 32:19 (R. Kaminski)).  JX 27.[23]

In sum, the government has shown no factual or legal basis for reopening the prior determinations that the wrong contracting officer terminated the contract, to the prejudice of United, and those rulings are maintained as the law of the case.[24]  As a consequence, the default termination made by the Air Force is converted to a termination for convenience.  *See* JX 4-9 to 10 (incorporating FAR § 52.212-4(m) (1999)) ("If it is determined that the [g]overnment

_____

[23]UL "approvals" of electrical raceways had also been addressed by the Air Force in contradictory ways.  In the Cure Notice, the Air Force had cited the absence of UL approvals for United's electrical raceways.  *See* JX 29.  However, it then indicated to United that UL approval of the raceways was not an issue, *see* JX 11, but then reversed itself yet again in the Show Cause Notice.  *See* JX 32 (citing Cure Notice).  By the time of the Show Cause Notice, United had obtained a UL listing for the raceway, *see* Tr. 211:4-13 (M. Kaminski), but that listing appears not to have been taken into account by the Air Force.

[24]"Reassertion of an argument previously made and carefully considered is not a valid basis for reconsideration."  *Pinckney v. United States*, 82 Fed. Cl. 627, 632 (2008) (citing *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 243 (2003); *see also Information Scis. Corp. v. United States*, 88 Fed. Cl. 626, 631 (2009) (same).  Rather, reconsideration is appropriate upon "(1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) . . . to prevent manifest injustice."  *Matthews v. United States*, 73 Fed. Cl. 524, 526 (2006).  None of those circumstances appertains here.  Notably, although additional evidence was adduced at trial, that evidence is fully consistent with the materials considered previously and it supports the conclusion that the default termination was improper.

improperly terminated this contract for default, such termination shall be deemed a termination for convenience.").

## II. CONSTRUCTIVE TERMINATION FOR CONVENIENCE

With a termination for convenience, United became entitled to payment for work performed plus a reasonable profit. This may be calculated as a percentage of the contract price reflecting the proportion of work performed prior to the termination. *See* JX 4-10 ("Termination for the Government's Convenience").

### A. *Work Completed by United*

The total amount of United's contract was $108,404. JX 2-1. To date, the government has not paid United anything under the contract. Stip. ¶ 10. Nonetheless, United performed most of the work required under the contract, *see* Tr. 170:7-13 (M. Kaminski), and it obtained and delivered all of the further materials necessary to complete the contract. *See* Tr. 154:13-22 (M. Kaminski); JX 21-2 to 4. The only significant work United did not complete was demolition of two modular buildings.[25] The contract required United to remove three existing modular offices from Luke AFB. JX 2-5 at ¶ 17. One modular structure was removed at the outset of United's work because it was located in the area designated for the new modular building, but United was unable to remove the other two offices because they housed the Air Force personnel who were supposed to move into the United building. *See* Tr. 208:2 to 209:20 (M. Kaminski). Because damages under a termination-for-convenience framework only include payment for work actually completed, United cannot recover that portion of the contract representing the removal of these two buildings. The Air Force contracted with Allied Modular to remove these two buildings at a price of $7,987.50. JX 42-1 to 2; Tr. 502:11-13 (Peithman). That price represents a reasonable estimation of payment and profit for the work.[26] Therefore, the damages awarded will be reduced by that amount.

---

[25]United was unable to install two air conditioning units and carpeting because the Air Force failed to remove swamp coolers where the air conditioning units were to be situated. Tr. 168:10 to 170:22 (M. Kaminski). The percentage of the contract award attributable to these two installations is *de minimis* and will not be considered in calculating damages.

In addition, United did not complete a punch list of corrections to its installation, but it was not allowed back on Luke AFB for that purpose before its installation was removed. The court also finds that a punch list was prepared by the Air Force but not sent to United.

[26]United's claim that it could have removed the two buildings at no cost or at a profit by salvaging materials is not supported by adequate proof.

B. *Allowance for the Government's Rights Under the Inspection-Acceptance Clause*

The constructive termination-for-convenience doctrine also encompasses the principle that United "may not recover more than would have been available if the government exercised all of the rights available to it, irrespective of any errors or omissions by the government contracting officer." *Torm*, 64 F. Supp. 2d at 313 (citing *College Point Boat*, 267 U.S. 12); *see also John Reiner & Co.*, 325 F.2d 438. This principle may limit a contractor's recovery even when the government wrongfully terminated the contract. For example, in *Torm*, A/S Dampskibssetskabet Torm, a Danish ship-owning company contracted with the Military Sealift Command, an agency of the United States government, to carry jet fuel from Kuwait to Japan. *Torm*, 64 F. Supp. 2d at 300. When contaminants were discovered at the loading stage, the government attempted to terminate the contract for default, *id.* at 304-05, but failed to provide Torm with sufficient notice and opportunity to cure. *Id.* at 311-12. Although the termination was unjustified, the court nonetheless held that the government was entitled to cancel under the contract's inspection clause, which allowed for unilateral cancellation, even though the government had not contemporaneously asserted that clause as a basis for the termination. *Id.* at 312-14.

This case is similar to *Torm*. Even though the Air Force's termination for default was invalid, the government may nonetheless limit United's recovery based on the rights it had available to it under the inspection-acceptance clause of the GSA Contract. This clause entitled the government to inspect or test supplies and required United to repair or replace nonconforming supplies:

> The [g]overnment reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The [g]overnment may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The [g]overnment must exercise its post acceptance rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

JX 4-9 ("Contract Terms and Conditions - Commercial Items") (incorporating FAR § 52.212-4(a) (1999)). Applying the constructive termination-for-convenience doctrine, the government need not pay United for any supplies tendered which, if tested or inspected, would have been found to be nonconforming and would have required replacement.

The wall units provided by United are chiefly at issue in this regard insofar as their fire rating is concerned. *See* Def.'s Post-Trial Br. at 9. United bears the burden of proof to establish that its wall units conformed to the contract if it wishes to recover damages for providing the wall panels. *See Lisbon Contractors*, 828 F.2d at 767 (plaintiff bears burden of proof to establish termination-for-convenience damages).

23

The contractual requirements respecting the wall units are encompassed in one sentence: "The modular building walls shall be 4" minimum thickness 9' high and shall be Class-A fire rated and shall be UL Approved; color to be selected upon award." JX 2-3. The parties agreed on the specific wall materials to be used at a pre-award meeting after the Air Force requested a durable wall material, prompting United to use hardboard instead of gypsum for the wall substrate. Tr. 142:13-23 (M. Kaminski). Air Force personnel also selected the vinyl wall covering to be used. Tr. 105:9-24 (R. Kaminski). United could have persevered in using a gypsum-based substrate and could have provided a different wall finish. Indeed, United had installed other prefabricated buildings for Luke AFB that had different substrates and different wall finishes. *See* Tr. 106:3-10 (R. Kaminski). Nonetheless, that the Air Force selected specific materials for the wall system at the pre-award meeting does not absolve United of the contractual requirement to provide a Class A fire rated wall. The Air Force did not knowingly waive the fire rating requirement.

Although the Air Force had a right to inspect and test the wall system to determine whether it was Class A fire rated, *see* JX 4-9 at ¶ 1; JX 22-1 (Mem. from Kelley to United referring to a recent inspection), it did not contemporaneously test the wall system or require United to do so. Tr. 534:14 to 536:3 (Janders). The Air Force's concerns about the flammability of the hardboard and the vinyl did not in and of themselves justify a finding that the wall was nonconforming, particularly in light of the manufacturer's representation forwarded by United which stated the hardboard was Class A fire rated. *See* JX 5; Tr. 31:16 to 32:19 (R. Kaminski); Tr. 175:19 to 176:7 (M. Kaminski).[27] Moreover, United's inability to provide documentation that the vinyl covering was Class A fire rated, *see* JX 44-75, would provide justification for having the material tested, not for rejecting the wall system as nonconforming. The Air Force itself seemed to understand that a test was necessary. *See* JX 44-67 (E-mail from Meyer to Lieutenant Colonel Triplett) (stating: "The contractor will have to have the wall system tested by a certified testing lab. If the wall passes, the contractor will probably be given the chance to finish the building."). The failure by the Air Force to provide for testing supports the conversion of its termination for cause into a constructive termination for convenience, but it does not exonerate United from supplying a wall system that satisfied the contract's fire-rating criterion.

In the circumstances, the years-belated test of wall-system components completed for the government in preparation for this litigation limits the damages available to United. The result of the test of United's wall components was not close. The United partition wall was found to have a Flame Spread Index rating of 195, putting it at the most flammable end of the Class C range. JX 47-3 (noting that a Class C rating is less than 200).

---

[27]The Air Force at one point seemed satisfied that the hardboard was appropriately rated when it stated that the fire rating of the vinyl covering was the only outstanding issue with the wall system, *see* JX 10; JX 11, but the Air Force later reversed this position when it terminated the contract in part because it believed the hardboard was "a highly flammable product." JX 27-1.

United does not dispute the result of the test, *see* Stip. ¶ 16, but argues that the test nonetheless does not support a conclusion that the "wall system" was not Class A fire rated. Pl.'s Post-Trial Br. at 20-21.  United argues that the test was not a true test of the "wall system" because the tested panels included the vinyl wall covering but did not incorporate the aluminum caps that enclosed the wall components.  Pl.'s Post-Trial Br. at 21.  These contentions are unpersuasive.  The vinyl covering of the wall panels was pertinent.  United purchased the hardboard with the vinyl covering already attached or sent the hardboard to contractors for the vinyl to be laminated to the hardboard.  *See* Tr. 229:3-13 (M. Kaminski).  The omission of aluminum caps may have been more problematic because the omission allowed fire to reach the interior of the wall system at its edges and spread more quickly.  Pl.'s Post-Trial Br. at 20-21.[28] However, United did not have a test run with the wall panels encased in aluminum framing and without their vinyl covering to see if a different result might have emerged.[29]  Taking all the evidence about the wall panels into consideration, United has not convinced the court that the wall panels would have achieved a Class A fire rating under the pertinent testing protocols.  Consequently, the Air Force would have had the right under the contract to require United to repair or replace the wall panels.  Under the principles applicable to a constructive termination of convenience, the government is not required to pay for a wall system that did not conform with the Contract.

The pricing for the materials United used in its contract with Luke AFB was pre-approved by the GSA office for use in all FSS contracts.  *See* JX 19-1; Tr. 86:25 to 87:20 (R. Kaminski).  United's GSA price list included pricing for the 4" wall panels used by United in this project, which encompassed a complete wall panel including the foam core.  *See* JX 19-4; Tr. 93:13-21 (R. Kaminski).  The price for the wall panels was $41 per linear foot, or $164 per 4' panel.  JX 19-4 (price for 9' high, 4" fire retardant wall system).[30]  United used approximately 312 linear feet of wall panels for the modular building.  *See* JX 2-2.  Therefore, United's recovery shall be reduced by $12,792 (312 linear feet at $41 per linear foot) to take into account the nonconforming wall system.

---

[28]However, testing of the wall panels with aluminum caps arguably would have been inconsistent with the testing protocols that are applied to determine flame spread.  *See* Tr. 412:9 to 413:7 (McLauchlan) (describing the protocol for the flame testing).

[29]Although the government reportedly had the wall panels tested without the vinyl covering, *see supra*, at 16 n.18, no evidence was adduced at trial respecting the results of any such test.  The government's expert witness who testified regarding the testing, Mr. McLauchlan, did not identify any test performed on the wall panels without vinyl covering, and he was asked no questions on cross-examination about such a test.

[30]Robert Kaminski at one point calculated the cost for the wall panels at $260 a panel, but United has acknowledged that calculation was incorrect.  *See* JX 17-3 (calculating the cost for 33 panels to be $8,580); Tr. 123:14-19 (R. Kaminski); Def.'s Post-Trial Br. at 23-24; Pl.'s Reply Br. at 10.

### III.  THE GOVERNMENT'S CLAIMED REPROCUREMENT COSTS

United's claim may further be set off by "[a]ny claim which the [g]overnment has against the [c]ontractor under the Contract."  FAR § 52.249-2(k)(2).  The government seeks reprocurement costs of $7,987.50 because it paid that amount to Allied Modular to remove the two existing modular buildings at Luke AFB that remained when United was asked by the Air Force to leave the job.  Def.'s Post-Trial Br. at 24-25.  However, United could not demolish the buildings until it finished construction on the new office and the personnel housed in the old buildings were moved into the new office.  *See* Tr. 208:2 to 209:2 (M. Kaminski).  When the Air Force stopped the work and sent United's installers home, the installation of the new office was complete except for installation of the air conditioning systems and carpeting.  Tr. 168:12 to 170:13 (M. Kaminski).  At that time, the Air Force was focused on removing the swamp coolers to enable United to install the air conditioning units.  *Id*.  Subsequently, the Air Force never invited United back to complete the installation or demolish the two buildings.  The Air Force's improper termination of United's contract for default, among other things, caused the Air Force to contract with Allied Modular to remove the two existing buildings after it had removed United's newly installed modular building and installed a new building of its construction.  *See* Stip. ¶ 17.

Under the prevention doctrine, the government may not obtain reprocurement costs for work that it prevented United from performing.  *See, e.g., Short Bros.*, 65 Fed. Cl. at 799.  Although United may not be awarded damages for that portion of the Contract representing the removal of the two buildings because it never performed the work, the government may not be awarded the costs of the reprocured demolition when it prevented United from performing.

### IV. INTEREST

The Contract Disputes Act provides that "[i]nterest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to [41 U.S.C. § 605(a)] of this title from the contractor until payment thereof."  41 U.S.C. § 611.  Section 605(a) states that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."  41 U.S.C. § 605(a).  United filed a formal written claim under the Contract Disputes Act requesting payment of $108,000 for the work it had completed under the contract, *United Partition*, 59 Fed. Cl. at 632, which claim was received by the Air Force's contracting officer at Luke AFB on January 28, 2002.  *Id*.  The court finds that United is entitled to interest on its claim from that date.  *See, e.g., Pinckney v. United States*, 88 Fed. Cl. 490, 516 (Fed. Cl. 2009); *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 295 (2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007).

**CONCLUSION**

For the reasons stated, the court finds that the government improperly terminated the contract for default.  The termination is converted to a constructive termination for the government's convenience.  The court awards United $87,624.50, representing the contract price of $108,404 less $7,987.50 for removal of two buildings and $12,792 for the nonconforming wall panels.  The court also awards United interest on this amount at the rate specified in 41 U.S.C. § 611, calculated from January 28, 2002.  The court denies the government's claim for excess reprocurement costs.  The clerk shall enter final judgment for United and against the government for the specified amount plus interest.

No costs.

It is so ORDERED.


/s/ Charles F. Lettow_____
Charles F. Lettow
Judge